OPINION OF THE COURT
Alan C. Marin, J.
This is a claim brought under the Unjust Conviction and Imprisonment Act of 1984, section 8-b of the Court of Claims Act. Raul Morales was convicted of rape in the first degree and sentenced to a prison term of 12V2 to 25 years by a judgment rendered April 11, 1988. Years later the complaining witness changed her story, recanting at a hearing conducted under CPL article 440 at which the judgment was vacated and the *841 indictment dismissed. Morales was released from custody after serving nine years and one month of his sentence.
At the criminal trial, Evelyn Muniz testified that Morales raped her on the night of June 20, 1987 in her apartment. The CPL 440.10 hearing was conducted May 12, 1997, but Muniz died in August of 1999, just weeks before the Court of Claims Act § 8-b trial, defeating the expectation that her altered view of events could be evaluated in person. Claimant denies ever having sexual relations with Muniz.
Some basics are not in dispute. In 1984, Morales had become the superintendent of a residential building located at 778 Union Avenue in the Bronx, and lived on the first floor in apartment 4. In the spring of 1987, a few months before the alleged rape, Muniz moved into the basement apartment with Felix Santana, whom she described as her husband.
On June 20, 1987, the grandparents of claimant’s wife were having a party to celebrate their 50th anniversary. In the late afternoon, Morales, his wife, Llamara, and their two children, both under the age of five, attended a church service for the anniversary couple. They proceeded to the house of Llamara’s aunt to pick up some food and then traveled to the party which was taking place at a community center some distance away.
Approximately 60 to 100 persons attended the party. Alcohol was served, and Morales drank three beers and a gin. Muniz did not attend the party, but Santana arrived late to assist with the cleanup. Muniz was thus alone for some portion of that night. The next morning, the police were summoned and claimant was arrested.
Access to the basement required the key to a locked door of which Morales, as building superintendent, was in possession. Beyond that was the Muniz-Santana apartment, the door to which was never locked. Muniz was 22 years of age at the time, but in poor health. She had muscular dystrophy, weighed only about 75 pounds, and was wheelchair bound.
There is essential agreement on the above details, but the timing of events is disputed, having become part of the architecture of an alibi. Claimant stated that he left the party between midnight and 1:00 a.m., but the following exchange with him called that into question: “Q. Did you know that the police officer made a note that you stated that you arrived [back home] at 11 p.m.? A. Yes.” Morales went on to explain: “He took down the time that my wife told him. At the moment he asked the question, we didn’t know what time we arrived.” *842 Morales added that at his criminal trial his wife testified he arrived home at 1:00 a.m. Claimant recounted that he went out at about 10:00 p.m. to buy a pack of cigarettes and was gone for some 10 to 15 minutes. Alex Aponte, testifying on behalf of claimant, said that he left the community center at midnight and Morales was still there; Aponte, like Morales, had left the party once and returned.
At the criminal trial, Muniz testified that Felix Santana started out from their apartment at 10:10 p.m. — asserting she had looked at the clock. She had expected him back at 1:00 or 2:00 a.m., but he returned home closer to 5:00 a.m. According to Muniz, the claimant entered her apartment at around 11:30, although she had initially said 11:00, admitting later that the earlier time was mistaken. The hospital records noted the time of assault as 11:00 p.m. She estimated Morales was there for 30 minutes, but fixed 12:15 a.m. as the time he left, again maintaining she had checked the clock.
CPLR 4517
The transcript of Muniz’ testimony at the CPL 440.10 hearing was admitted over the objection of the defendant. The issue, subsequently briefed by the partes, merits analysis; it also affects the admissibility of prior testimony by another witness. The former trial testimony of an unavailable witness, under CPLR 4517, is admissible in a civil action “by any party upon any trial of the same subject-matter in the same or another action between the same parties or their representatives.”[1] Unavailability is not in dispute — claimant’s first exhibit is Muniz’ death certificate, indicating that she died on August 7, 1999.
The language “same parties” on its face would ordinarily mean that both parties be the same. That construct has been breached by Healy v Rennert (9 NY2d 202 [1961]), which the defendant relies on for admitting Muniz’ testimony from the criminal trial. Rennert’s car hit a car driven by Healy, who was carrying a passenger, Toback. The passenger had testified against Rennert at an earlier criminal trial for violating traffic regulations. Toback was unavailable by the time Healy sued *843 Rennert, and the Court of Appeals ruled that his prior testimony should have been admissible against Rennert.[2]
Muniz’ CPL article 440 testimony was initially utilized against the People of the State represented by the Bronx County District Attorney, and here it is being used against the State of New York represented by the Attorney General. No case has been found that is on point; none has rejected the kind of use that claimant seeks here.[3] To exclude Muniz’ CPL 440.10 testimony would validate an asymmetrical rule of evidence: in this kind of case, the State Attorney General could always offer the testimony of any unavailable witness from the prior criminal trial who had been called to the stand by the District Attorney, but the claimant could always be barred from using testimony of any unavailable witness who testified on his or her behalf when the claimant was a defendant in such prior criminal matter. The imbalance is highlighted in this instance when the witness switches sides so to speak: the initial supporting-guilt testimony is used against the claimant; the subsequent supporting-innocence testimony is blocked.
Healy (supra) moved beyond the literal sense of “same parties” because the touchstone is the opportunity to cross-examine: “It does not matter that in one instance it was a criminal action and the other a civil action, provided that the issue was so nearly identical that the cross-examination in both instances would normally cover the same field.” (Healy v Rennert, 9 NY2d, supra, at 209.)[4] To that effect, consider:
“Limiting the requirement to substantial, rather than literal, identity of parties is fully justified and desirable * * * So long as the party in the first action had the same opportunity, motive and interest to cross examine as the party in the second action, there is sufficient guaranty of credibility of the prior testimony to permit it to be used.” (9 Weinstein-Korn-Miller, NY Civ Prac ¶ 4517.32.)
*844 “The prior testimony exception to the hearsay rule offers the maximum guarantee of trustworthiness since the original statement was made in court, under oath and subject to cross-examination by a party who had the same motive to expose falsehood and inaccuracy as does the opponent in the trial where the testimony is sought to be used.” (2d Preliminary Report of Advisory Comm on Practice & Procedure, 1958 NY Legis Doc No. 13, at 265, quoted in Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4517, at 94, and by Court of Appeals in Fleury v Edwards, supra, 14 NY2d, at 339.)
Accordingly, the CPL article 440 testimony of Evelyn Muniz is admitted. Now what of Dr. Mohammad Hassini, whose testimony Morales seeks to introduce as part of this case? Hassini testified for the prosecution in the criminal trial and was cross-examined by Morales’ lawyer whose purpose was to undermine the doctor’s testimony so as to suggest no rape occurred. Morales now wishes to use the testimony against the State, whose goal with cross, had Hassini appeared, would have been to show that rape did occur. The motive and interest to cross-examine are opposite; consequently, Hassini’s prior testimony must'be excluded.[5]
Medically then, claimant’s sole authority for the absence of semen was a reference in Muniz’ criminal testimony: “Ms. Muniz also testified that she was aware that the medical findings showed that there was no sperm present” (claimant’s brief, at 7, referring to defendant’s exhibit D, at 98). Even if credible evidence therefor existed, such does not support claimant’s sort of a fortiori argument from the DNA cases: “There was no semen present in this case to have DNA testing, because there was no actual rape of Evelyn Muniz” (brief, at 27).
Morales’ case thus essentially consists of the following: the claimant’s trial testimony; the testimony of Morales’ one witness, Alex Aponte, on claimant’s whereabouts that June night in 1987; and Muniz’ CPL 440.10 testimony.[6]
*845 The defendant’s entire case is Muniz’ criminal trial testimony and material relating to certain sex offender programs taken by Morales in prison which are offered as admissions. Muniz’ 1988 testimony is less than crystalline, including: the timing; her uncertainty on the specifics of the sexual assault; and the possible inconsistency between the medical records which appear to indicate no bruising (we lack Dr. Hassini’s testimonial evaluation) and the witness telling of being slapped, punched twice in the mouth and three or four times in the ribs. Of course, someone going through what Muniz contended happened to her could well have her ability to observe and recall severely shaken.
The sex offender program documents were introduced through James Granger, then an assistant director of guidance and counseling for the Department of Correctional Services. I view them as having no probative value. Whether voluntary or mandatory — and Morales took both types — the failure to enroll would have had negative consequences, affecting his consideration for parole, and in the case of the mandatory program at Oneida Correctional Facility, the possibility of the issuance of a misbehavior report, which could result in “loss of privileges * * * Loss of recreation perhaps, loss of packages or personal clothing.”
Each of the three components of claimant’s case has its problems. Morales’ testimony is weakened by his prior felony conviction, which implicates only claimant’s credibility, not his disposition to commit the particular offense. As defendant’s counsel stated on the record: “I am not offering this to show that Mr. Morales has the propensity to commit further and other rapes. It is being offered on credibility only, and to show that he puts his interests above those of society.” Claimant objected at trial; in his brief the objection, supported by Evans v Willson (133 Misc 2d 1079 [Civ Ct, NY County 1986]), is more pointed toward the argument that disclosing the nature of the prior felony was prejudicial.[7]
Aponte was claimant’s alibi witness. They were at a party with as many as 100 people — keeping tabs on one another *846 would presumably be difficult. Aponte remarked that it occurred so long ago he could not remember if he initially left the party at 9:00 or 10:00 p.m. He stated that after his return, he recalled seeing Morales at midnight; what if his margin of error here was also one hour or so? Further, he was the godfather of claimant’s son. The claimant was “like my brother” who was “welcome in my house. I love him very much.”
The anniversary party was a family gathering. Claimant probably knew numerous, if not dozens, of individuals, yet put only Aponte on the stand. Claimant testified that he left the anniversary party “[bjetween 12:00 and 1:00” with his wife, two children and Alberto Velasquez, “who took us to our house.” At one point in his testimony, Morales described the location of the celebration as two to three miles from his Union Avenue residence; at another point, a seemingly greater distance, taking 20 to 25 minutes by car. Morales did not call his wife to the stand, explaining they were estranged and he had not seen her since 1987. The two did speak by telephone in mid-1999; she said she did not have enough money to travel to the trial, and claimant did not offer to pay for the trip.
Muniz presented just about the same persona at the post-judgment hearing as she did before the jury:
“the court: I have a question for you, Miss Muniz. In 1988 when you were in my courtroom testifying under oath in front of a jury, I remember that you were as sincere as you were now. Would that be fair to say?
“the witness: Yes.
“the court: You testified under oath in front of a jury and your tears flowed just as they are now, right?
“the witness: Yes.
“the court: You looked fairly much the same, I must say you have not changed much in ten years; isn’t that right?
“the witness: I would not say that.
“the court: How did you change?
“the witness: I am telling the truth this time.
“the court: * * * If you look the same [as] in 1988 * * * and you cried * * * and you used the same tone of voice when you testified in 1988 as you are now, please tell me, Ms. Muniz, how am I supposed to tell when you are lying and when you are telling the truth?
*847 “the witness: I don’t know how to answer that question.” (Claimant’s exhibit 2, at 34-35.)
Notwithstanding the foregoing, seeing and hearing Evelyn Muniz from a few feet away should have afforded more insight into what happened on June 20 and 21 of 1987. With that said, even in print, her CPL 440 testimony is not without power:
“Q. During the month and a half that you were there before the charge was filed and you knew * * * Mr. Morales, had he ever * * * made any advances towards you?
“A. No.” (Claimant’s exhibit 2, at 8.)
“Q. What [were] your dealings with him * * *
“A. [H]e kind of knew what was going on with Felix and I * * * Felix was beating me at the time and Raul [Morales] knew about this and he offered to help me * * * it was a baptism for his son, for Raul’s son.
“We were invited and Felix stepped out for a while and Raul said to me if you have any problems just let me know and I will take care of it, regarding Felix and I guess Felix overheard somehow and he just lost it * * *
“He just couldn’t handle that * * *
“Yes [he got angry] and later it escalated to me getting beat up.
“Q. Why are you coming forward now?
“A. I have been having a lot of nightmares and a lot of bad feelings about it and it all built up and I can’t take it anymore.
“Q. What happened when he came home at 5:00 in the morning * * * had he been drinking?
“A. Yes * * * He was fiddling with the television and saying something is not right, and he just turned and slapped me * * * he just started telling me someone was there and I said no one was here * * * and he hit me again and he said Raul raped you, didn’t he and I said no. No one was here up until you came * * * he kept hitting me and grabbed me and threw me on the bed and just kept beating me and I said yes, okay.
“I was afraid for my life, your Honor and that’s why I lied.
“Q. What was Felix’ feelings besides that one incident * * *
“A. He just didn’t like the way Raul looked at me * * * He was jealous of him and what he had, the job * * * He wanted the job and there was an incident that he told me we are going to, I [want] to get rid of Raul any way I can and—
“Q. What happened after Raul was arrested as far as the job goes?
*848 “A. Felix took over the position.
“Q. Felix was the only one taking care of you at that time; correct?
“A. Yes.
“Q. You were dependent on him for washing you and feeding you?
“A. Yes.
“Q. * * * used drugs at the time * * * you were with Felix, who supplied you with the drugs?
“A. Felix did.
“Q. * * * as a result of now saying that you lied when you testified at trial do you know what could happen, what are the consequences?
“A. I don’t know I could go to jail for one.
“Q. Anything else?
“A. I could be sued by Raul and his family * * * Whatever is going to happen is going to happen. I mean I can’t change it. I want to make things right.”
In the summer of 1992, after an incident during which Santana choked and beat her, Muniz left him for good, went to Goldwater Hospital, and then in 1996, to an apartment of her own; in each setting she had 24-hour care.
Under the Unjust Conviction and Imprisonment Act, a claimant must prove innocence by clear and convincing evidence, a “heavy burden” which makes the task facing a claimant “certainly not a simple one.” (Reed v State of New York, 78 NY2d 1, 11 [1991].) Clear and convincing evidence is evidence which satisfies the trier of fact that it is “highly probable” that what the party with such burden contends happened is what actually occurred (PJI3d 1:64). It is a standard which serves to “ ‘ “impress the factfinder with the importance of the decision.” ’ ”[8] Such proof cannot be “ ‘ “loose, equivocal or contradictory.” ’ ”[9]
Inherent, of course, in any recantation is that the wit *849 ness has lied once about what happened; nonetheless, compliance with the Court of Claims Act § 8-b evidentiary requisite could be satisfied with sufficiently credible evidence. Claimant’s basic testimony, in view of his demeanor and presentation, is not especially believable; when the specific credibility problems are factored in, his testimony lacks sufficient weight to add measurably to his case. With respect to the alibi, even accounting for the passage of a dozen years, claimant called only Alex Aponte to the stand, who regards Morales as a brother. Claimant did not call the person who drove him home (Alberto Velasquez); he did not call his wife, Llamara; and he did not call anyone else from the 60 to 100 people who were present at the anniversary party. Clear and convincing — a standard of highly probable — is thus an evidentiary hurdle which Raul Morales cannot surmount.
Accordingly, his claim is dismissed; and any motions which have not been ruled upon are hereby denied.

. The phrase “or their representatives” does not affect this inquiry; the term covers testimonial submissions against a party acting in a different legal capacity than in the prior proceeding, such as the executor of an estate. (See, Martin, Capra and Rossi, New York Evidence Handbook § 8.4.2.)

. Section 348 of the Civil Practice Act was, for our purposes, comparable to its successor, CPLR 4517. (See, Fleury v Edwards, 14 NY2d 334 [1964].)

. The issue arose, but was not developed, in Hernandez v State of New York (Ct Cl 1997, claim No. 85915, affd sub nom. Cruz v State of New York, 250 AD2d 642 [2d Dept 1998]), with the appellate court pointedly observing: “We note that the order appealed from did not address the issue of whether the original claimant’s testimony from a prior criminal trial is admissible in the instant claim pursuant to CPLR 4517, and we do not reach that issue.”

. See Matter of White (2 NY2d 309 [1957]) in which Judge Van Voorhis, who went on to author Healy (supra), led a three-Judge dissent against allowing testimony otherwise in compliance with the statute (Civ Prac Act § 348; see, n 2, supra), but without the opportunity of cross-examination.

. Claimant cannot rely upon the legislative intent of the Unjust Conviction and Imprisonment Act, which provides that this court “shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses.” (Court of Claims Act § 8-b [1].) Such language is governed by the phrase “as permitted by law,” and it would not trump a more specific statute, viz., CPLR 4517.

. Claimant called the Reverend Derek Ford, the clergy-penitent privilege having been waived. He was not permitted to testify as to the substance of his consultations with Muniz in 1996. What can be drawn from Ford’s *845 testimony was that Muniz’ conversations with him predated her discussions with the Bronx County District Attorney’s Office leading to the CPL 440 hearing. Similarly, Muniz’ brother Robert was allowed to testify only generally as to her medical condition; he was not permitted to testify about a conversation he had with Evelyn in 1996.

. “The classic criminal solution for such a situation is the Sandoval compromise — the prosecutor is allowed to ask if the defendant witness was convicted of a felony or misdemeanor without specifying what that felony or *846 misdemeanor was * * * Such a step is called for here [in this civil suit].” (Evans v Willson, 133 Misc 2d, supra, at 1081.)

. Solomon v State of New York, 146 AD2d 439, 440 (1st Dept 1989), quoting Addington v Texas, 441 US 418, 427 (1979).

. Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 220 (1978), cited in Ortiz v State of New York (Ct Cl 1999, claim No. 96390). See the recent appellate case of Vasquez v State of New York (263 AD2d 539 [1999], lv denied 94 NY2d 754 [1999]) in which the Second Department reversed a Court of Claims ruling that claimant had proved her innocence by clear and convincing evidence.