OPINION OF THE COURT
Alan C. Marin, J.
*932 This is the decision following the liability trial of the claim of Don Taylor brought under the Unjust Conviction and Imprisonment Act, which is section 8-b of the Court of Claims Act. Mr. Taylor had been convicted for the murder of Terrance Joyner on a Bronx street in the early hours of August 16, 1987.
The prosecution’s case against Taylor was based on the testimony of Omar Portee, who claimed to be an eyewitness. Taylor was convicted on April 25, 1989 and sentenced to a term of imprisonment of 22V2 years to life. Mr. Portee eventually recanted and said he had lied in identifying claimant as being involved in Joyner’s murder. Following a request therefor by the Bronx District Attorney’s office, Justice Steven Barrett issued an order on January 27, 2004, which vacated Taylor’s conviction, dismissed the underlying indictment and directed his immediate release from state prison.
At claimant’s criminal trial, the only witness, other than Portee, who testified about what happened that night was Evelyn Hall. Ms. Hall, who died some time ago, never identified claimant as the man who pulled out and fired his gun, or who was even at the scene of the crime. Hall testified that when Joyner was shot, she was with him; she described Joyner as a friend she had known for about a month:
“We were walking down Grand Avenue and we got to the corner of 184th Street, we crossed the street. And we were walking up 184th towards Davidson. And on the opposite side of the street, two guys, they called out to us . . . So, the guy said that they — that they had some nickels [drugs], and — so, Terrance crossed the street to approach the guys to talk to them, and I followed.” (Defendant’s exhibit F, at 234-235.)
Hall stated that one dealer “pulled out the nickels,” showed them to Joyner, who said “he didn’t want anything because he didn’t have enough money.” At some point, one man said that Joyner had “stole one of his nickels.” Voices were raised; Hall and Joyner walked away and turned the corner onto Grand Avenue. One of the two men ran up behind them and threw a bottle at Joyner, which hit him in the head. He went down, holding his head, and “when he came back up, the other guy was coming at him from another direction. And that’s when he lifted up his shirt, and pulled out the gun, and he shot him.” (See defendant’s exhibit F, at 236-239.)
Joyner was shot in front of 2380 Grand Avenue near 184th Street; it was about 2:40 a.m. on a Sunday morning. Joyner died *933 from one shot to the left side of his chest. A gun and magazine were recovered at the grocery store across the street,[1] but the ballistics tests were inconclusive. It is not in dispute that one of the two drug dealers was Robert Elliot.
Portee’s Recanted Testimony
Portee identified Don Taylor as the shooter at a police precinct lineup and from the witness stand at Taylor’s criminal trial. Years later, in 1998, following the discovery via a Freedom of Information Law (FOIL) request of Detective Morris Schwaber’s notes on the case, counsel for Taylor interviewed Portee, who was then incarcerated at Clinton Correctional Facility. Apparently there were two interviews, and in 1999, Portee gave a sworn statement that he had testified falsely against claimant. This led to a follow-up by the Bronx District Attorney’s office, which was delayed for a considerable period of time because Portee’s lawyer denied access to his client until a federal case against him was concluded.
On January 7, 2004, Assistant District Attorney (ADA) Jeremy Shockett interviewed Portee in a federal detention facility in Florida; Shockett testified that Portee told him that Don Taylor was not involved in Joyner’s shooting. Portee was thereafter deposed on June 5, 2007 at the federal prison in Florence, Colorado, and his testimony, in which he denied witnessing the murder and having any knowledge of claimant’s involvement, was read into evidence at trial.
Recanted testimony is generally viewed as unreliable. As this court has observed in another case brought under the unjust conviction statute: “Inherent, of course, in any recantation is that the witness has lied once about what happened” (Morales v State of New York, 183 Misc 2d 839, 848-849 [Ct Cl 2000], affd 282 AD2d 245 [1st Dept 2001]). However, given, among other things, Portee’s incentive to lie and Evelyn Hall’s testimony implying that Portee was not present at the shooting, Portee’s recanted testimony is more credible than his initial story. Portee’s Incentive to Lie
Back in the fall of 1987, Portee was facing multiple charges in New York that could have led to substantial prison time. Instead, as part of a cooperation agreement, which included his testimony in People v Taylor, Portee was allowed to plead to 2 to 6 years for all charged crimes, received credit for 21 months’ *934 time served and was promised a favorable letter to the parole board.[2] In addition, Maryland authorities agreed to withdraw their pending extradition request for Portee. By contrast, in connection with his recantation, there was no showing that Portee was promised or received any benefit. Defendant’s argument that Portee wanted to clear himself of having been regarded as a snitch because of his original testimony against Taylor is unpersuasive. The defendant also contends that the recantation came without risk inasmuch as the statute of limitations for perjury has run.
The prosecution, in the persons of Bronx ADA James Palumbo, and New York City Police Department Detective Morris Schwaber in 1987, went through extraordinary efforts to shore up their deal with Portee. They allowed him a private, probably conjugal, visit at the DA’s office with his girlfriend Reva Johnson, who testified to that effect at the section 8-b trial. Moreover, apparently to demonstrate some connection between Portee and Taylor, Palumbo and Schwaber went along with an unlikely story Portee told about a 25-minute phone call between him and Taylor in 1988 when both were incarcerated at different New York City jails — Portee at Rikers Island and claimant at the Bronx House of Detention. This was, in fact, virtually impossible to arrange; among other things, only outgoing calls were permitted with a maximum of six minutes on a system with limited technological capability. (See Letter from acting director of Telecommunications Division of New York City Department of Correction, Apr. 6, 1990, claimant’s exhibit 27.)
Inconsistency with Evelyn Hall’s Testimony
Ms. Hall’s testimony that she was with Joyner when he was shot has gone unchallenged. However, it is possible that given the circumstances and Hall’s admitted drinking and drug use, she became confused about what happened. With that said, her description of what she saw leads to the conclusion that Portee was not on the scene, and therefore did not see the shooter, whoever he was.
Portee’s trial testimony had the shooter coming from a different direction than Hall’s testimony, and Portee said Joyner was smashed over the head with a bottle, as opposed to having it thrown from a few feet away as Hall remembered. In addition,
*935 Portee said that as the confrontation began, he was standing on the sidewalk talking to Ms. Johnson, who was at or leaning out of her second floor apartment window — but Johnson lived a block away at 2308 Grand Avenue.[3]
Significantly, Hall told Detective Schwaber that the shooter was thin and five feet, seven inches tall. This information was missing from Schwaber’s notes that were later uncovered by the FOIL request. Taylor was five feet, nine inches, probably not that noticeable a difference, but the claimant was described then as stocky and 175 pounds.[3]
[4] The photograph of the lineup taken on the day of his arrest, September 10, 1987, shows a filled-out Taylor (defendant’s exhibit A; Taylor is number 4).
Adolphus Black
Adolphus Black’s testimony on Taylor’s behalf at his criminal trial was read into evidence at the section 8-b trial. The defendant State of New York argues that Black’s credibility is limited because in 1989, he had a criminal record, was serving a 6-to-12-year sentence for robbery, and admitted on the stand that he had once lied under oath in connection with his robbery of a stereo.
At the criminal trial, Black, who was then 19 years old, said that he had known Portee “since childhood.” The witness testified that in 1987 (Black was arrested for robbery on September 15, 1987), he and Portee were inseparable: “When he go out, I go. Where I go, he go.” He said that they were together in the early morning hours of August 16 at 30 Buchanan Place, and went down to the crime scene later in the morning at about 10:00 a.m. with a group of people. Black, who lived on 184th Street, testified that the place was full of police cars and erroneously believed it must have been 15 or 20 minutes after the shooting.
Claimant’s Credibility
Claimant testified before this court on January 5, 2009. This court also viewed the videotaped statement Taylor gave when arrested on September 10, 1987, some three weeks after the *936 crime. The videotape has deteriorated and is not complete, but the parties have agreed to its use as is; a complete transcript of Taylor’s video statement is in evidence (claimant’s exhibits 20A, 20).
To this trier of fact, Taylor was credible then and now. As for his arrest-day video, he came across as a young person, without artifice, trying to come to grips with something he did not understand. While it could be part of a contrivance, it seems highly unlikely that an individual who kills someone would not have an alibi at hand. Here, we saw Taylor thinking aloud, working through his schedule as if he had nothing to hide.
Taylor was asked if he remembered where he was on August 16. He responded “that the officer over there said it was like on a weekend, I know for every weekend I would be with my girlfriend . . . [Wendy].” Then, the following exchange ensued:
“Q. Do you know what day of the week August 16 is, or what day it was?
“A. See being that I know it was a weekend, cause like last month . . . the pay [day] . . . falls on every 7 day, 14, 21, 28, it had to be on Saturday or Sunday
“Q. You think you were with your girlfriend?
“A. See, I don’t know, because she went away last month too. Also, I’m not sure if it was on the week of the 16th or the 21st.
“Q. So you’re not sure [where you were on August 16]?
“A. No. [Claimant then went on to consider aloud whether he was in a recording studio at the time.]” (Claimant’s exhibit 20, at 322-323.)
Taylor at all times maintained his innocence. When at work on September 10, 1987, Taylor’s employer called him over and said that two police officers were there to see him; claimant at first thought that something had happened to a member of his family. Taylor refused three plea offers from the prosecution; the final one, offered during jury deliberations, was for only 2 to 4 years. At his sentencing, Taylor stated that he held no ill will toward the prosecution even though he was innocent of the crime — he expected to be exonerated on appeal.
Claimant’s alibi was that he was house-sitting for his girlfriend, Wendy Ladson, while she, her mother and brother were in South Carolina to visit Wendy’s ailing father. At the section 8-b trial, Taylor testified that the Ladsons had left the *937 Bronx on August 14; they returned the next weekend. Taylor said that at the time of the shooting, he was on the phone with Wendy.
Claimant gave notice before his criminal trial that his alibi witness would be Ms. Ladson and that at the time of the crime, he was on a long-distance call. However, in his alibi notice, claimant’s home address, not Wendy’s, was given as his location at the time.[5] The Ladsons lived at 3433 Dekalb Avenue, some 30 blocks from the crime scene; Taylor lived at 2825 Grand Concourse, which is closer, but still described as a 15-to-20-minute walk from where Joyner was shot. At the section 8-b trial, Taylor recalled that he had not hung out on Grand Avenue since 1983.
No physical evidence such as fiber or fingerprints connected Taylor to the crime. Claimant credibly testified before this court that he had never owned a gun or even fired one. Taylor testified, without contradiction, that he did not know Portee, Black, Hall, or Joyner. He was acquainted with Robert Elliot, but did not spend time with him.
By the summer of 1987, claimant had been working for about eight months for a home improvement company as an order packer. His schedule was Monday through Friday, from 8:00 a.m. to 4:30 p.m. At some point, Taylor was attending school, the Monroe Business Institute, every day after work. He recalled that he was taking a class in July in the summer session, but was unclear whether school was over by mid-August. His Monroe transcript indicates that he was not attending school then (claimant’s exhibit 4).
Claimant was an active congregant of his church. Taylor attended on Sundays and two nights out of the week; during the day on Saturdays and Sundays, he performed field service, which consisted of knocking on doors, offering Bibles and literature to the public.
Taylor had also become involved with the music business. He had formed a rap group, managed another, published a song and performed at block parties under the name of “Don Q,” which is how Portee became aware of him. Claimant described himself as extremely busy with the rap group that summer.
Taylor said that with some exceptions, usually for his music career and visiting Wendy at her home, his mother had him on a 10:00 p.m. curfew, although it was unclear whether that *938 included the weekends. Finally, it should be noted that there has been no showing that Taylor altered his normal activities from the day of the crime to the day of his arrest.
The details of claimant’s job, school, church and music activities do not serve as an alibi, but do give a sense of his ordered, busy life, and that the crime was at a time and place removed from his daily world.
Defendant’s Case
The defendant’s case at the section 8-b trial included the prior criminal testimony of Portee and Hall (defendant’s exhibits E, F), the deposition of former Detective Schwaber, taken in Florida on November 13, 2008 (defendant’s exhibit H), and the courtroom testimony of former ADA Palumbo. The 1989 testimony of Portee and Hall was discussed above. As for the testimony of Palumbo and Schwaber, it was notable that neither offered any argument that Taylor had been involved in the shooting. Detective Schwaber did have an independent recollection that Portee had been looking to make a deal, and, in a similar vein, Palumbo said that he had reminded Portee that without a deal, he would “get a lot of time.” When shown his paperwork from the case, Schwaber testified that at some point, two other individuals were suspects. (They are named in exhibit D and on page 77 of Schwaber’s deposition.)
Defendant cites claimant’s prior criminal record (and youthful offender status) as undercutting his credibility. Taylor was born in October of 1966 and had been arrested on October 15, 1983, for an attempted robbery two weeks earlier of a man in an elevator. Shortly thereafter, Taylor was accused of stealing a coat, and he was also charged in the vestibule robbery of a woman. Facing three robbery charges, he pleaded guilty in each case to robbery, so as to receive a one-year sentence and youthful offender status on the charges involving the elevator and vestibule robberies. At his section 8-b trial, claimant admitted that he was guilty of the elevator attempted robbery, denied the charge involving the woman, and explained that the jacket theft accusation arose out of an altercation at a party. He denied that any weapon was used or displayed on the elevator, and no evidence was offered to suggest otherwise. Prior convictions go to credibility, not disposition, and this court finds Taylor to be highly credible.
Defendant contends that Taylor’s alibi that he was in Ms. Ladson’s apartment telephoning her in South Carolina is *939 implausible, given that his original alibi notice to the prosecution stated that he was at his own home (claimant’s exhibit 45) and that the telephone record was never produced, although some efforts were made to locate it (see claimant’s exhibits 43, 44). This trier of fact notes that it does seem unusual that claimant would call Wendy at that hour when she was staying with relatives.
Defendant also takes issue with Portee’s explanation that he was able to pick Taylor out of a lineup because “[ejveryone else was crack heads. Don Taylor was . . . dressed in the same nature as me.” From this vantage, looking at a color photo of the lineup (defendant’s exhibit A), the participants do not seem so easily distinguishable, but as Portee stated, “I [had] seen him before.”
Under the Unjust Conviction and Imprisonment Act, claimant is required to prove by clear and convincing evidence that he did not commit the acts that were charged in the accusatory instrument.[6] This means that the trier of fact must be satisfied that claimant’s innocence is highly probable; such evidence cannot be equivocal or open to opposing inferences.[7]
A murder conviction resting solely on one eyewitness without any forensic evidence, the subsequent recantation by such accuser which was credible for a number of reasons (including Portee’s benefit from a plea bargain which required his testimony against Taylor and the incompatibility of Portee’s description of the crime with that of Evelyn Hall), together with a highly credible claimant constitute clear and convincing evidence that claimant was innocent of the shooting of Terrance Joyner. There being no issue that claimant caused or brought about his conviction by his own conduct, the defendant is liable to Don Taylor under section 8-b of the Court of Claims Act, and the Clerk of the Court is directed to enter interlocutory judgment against the State of New York on liability.

. Claimant’s exhibit 6.

. Claimant’s exhibit 17 is Portee’s plea allocution of June 28, 1988. Claimant’s brief states that when Portee was arrested on August 31, 1987, he faced 16[2]/3 to 50 years in prison.

. The admission of a 911 call log entry into evidence, an issue reserved at trial, is not necessary to the court’s conclusion here, but the log entry does support Hall’s version that the gunman came from the direction of a grocery store across the street. (See claimant’s exhibit 5; People v Brown, 80 NY2d 729 [1993].)

. Detective Schwaber’s case notes, or DD5s, do list the shooter as five feet, nine inches, but give his weight as 150 pounds (defendant’s exhibit I, at 65).

. See claimant’s exhibits 45, 47.

. The indictment contained one count for murder in the second degree (Penal Law § 125.25; see claimant’s exhibit 48).

. See PJI 1:64; Acosta v State of New York, 22 AD3d 367 (1st Dept 2005); Alexandre v State of New York, 168 AD2d 472 (2d Dept 1990); Vera v State of New York, 18 Misc 3d 1122(A), 2008 NY Slip Op 50154(U) (Ct Cl 2008).