Matter of Sabastian N. (Amy Z.) (2024 NY Slip Op 24069)

BODY {
font-family : "Times New Roman", Times, serif;
font-size : larger;
}

P {
line-height: 150%;
text-indent: 2em
}
.auto-style1 {
text-align: center;
}

[*1]

Matter of Sabastian N. (Amy Z.)

2024 NY Slip Op 24069

Decided on March 5, 2024

Family Court, Erie County

Carney, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.


Decided on March 5, 2024
Family Court, Erie County

In the Matter of a Parentage Proceeding Article 5-C 
of the Family Court Act Concerning Sabastian N. A child conceived as a result of Assisted Reproduction AMY Z., Petitioner 
LISA N., Interested Party
In the Matter of a Parentage Proceeding Article 5-C of the Family Court Act Concerning SULLIVAN N. 
A child conceived as a result of Assisted Reproduction AMY Z., Petitioner LISA N., Interested Party

File No. 244076

KELI ANN ILES-HERNANDEZ, ESQ.Attorney for Petitioner, AMY Z.CATHERINE MARIE VENZON, ESQ.CHAD THOMAS PIDANICK, ESQ.Attorneys for Respondent, LISA N.ASHLEY CORENE BLAHOWICZ, ESQ.Attorney for Children, SABASTIAN (4) & SULLIVAN (4)


Mary G. Carney, J.

PROCEDURAL BACKGROUNDBefore the Court are two petitions filed by Amy Z. (hereinafter referred to as "Amy") against Lisa N. (hereinafter referred to as "Lisa") seeking to establish parentage of the subject children, Sabastian and Sullivan, 4-year-old twin boys.
It is undisputed that Sabastian and Sullivan were born in November 2019 through the process of assisted reproduction, wherein Lisa was the gestating intended parent. Amy asserts that she too was the intended parent as she agreed to start a family with Lisa, participated fully in the assisted reproduction process, birthing and parenting of the children. Amy now seeks a judgment and declaration of parentage naming her as the lawful parent of Sabastian and Sullivan. The Attorney for the Children does not oppose this relief; however, Lisa objects on the grounds that Amy never adopted the children or otherwise moved to protect her parenting rights in a timely fashion. She argues that Amy must now be barred either by operation of law per Family Court Act § 581-206 or equity per the Doctrine of Laches.
The petitions seeking to establish parentage were filed in or around June 2023. The matter was originally heard by a Support Magistrate in Erie County Family Court who dismissed them on Lisa's motion in or around August 2023. The Support Magistrate's order stated in relevant part that the petitions were dismissed as "untimely" as they were "filed more than one hundred and eighty (180) days after the [children's] birth" citing Family Court Act § 581.206. Amy filed objections to the Support Magistrate's order in or around September 2023.
This court issued an Order and Decision on or around December 4, 2023 granting Amy's objections, vacating the order dismissing her petitions and restored the matter to the court's calendar. This court initially heard the matter on December 13, 2023 and set a hearing date to address parentage.
Testimony was heard on February 26, 2024 and February 27, 2024. The only witnesses to testify were Amy and Colby D. (Board Certified Nurse Practitioner employed by Buffalo Infertility and IVF Associates).
This Court has had the unique opportunity to evaluate and observe the demeanor, temperament and sincerity of the witness and assess their respective character and credibility. This Court has further considered the petitions, documentary evidence, applicable statutory and case law and now makes the following material findings of fact and conclusions of law.

FINDINGS OF FACT
Because Lisa did not testify, the factual background in this matter is undisputed. Both Amy and Colby D. were found to be exceptionally reliable and credible witnesses. The court also received several documents in evidence that supported and corroborated factual assertions made by each of the witnesses.
Witness: AmyAmy is employed as Vice President of Operations of M&T Bank. She has been so employed for ten (10) years. She presented as intelligent, forthright, and earnest. She remained measured and calm throughout her testimony but exhibited appropriate levels of emotion commensurate to the events she described. The emotion she displayed only served to underscore her sincerity. Her character and credibility remained sound even throughout a blistering cross examination.
Amy testified that she and Lisa commenced an intimate relationship in or around October 2014. By November 2014, Lisa had moved into Amy's home. They lived there together until approximately June 2022. In or around 2016, they established a domestic partnership by comingling [*2]funds and sharing insurance. Petitioner's Exhibit 1 in evidence is a copy of the parties' joint bank account at M&T Bank offered as proof that the parties comingled funds.
Amy testified that they also shared a health insurance plan through Lisa's employment among other benefits of having a domestic partnership. Amy proposed marriage to Lisa on or around New Year's Eve of 2016 (see, Petitioner's Exhibit 2 in evidence). Lisa also proposed marriage to Amy sometime later in the winter of 2018 (see, Petitioner's Exhibit 3 in evidence). Each of the proposals was accompanied by an offering of a gift to demonstrate the seriousness of the gesture, specifically a ring of engagement.
Amy testified that she and Lisa had been discussing starting a family and how they would do it. Because of their ages, she testified that they decided to start a family first before spending money on a wedding. Amy testified that since Lisa is ten (10) years younger, they agreed that she would carry their children, but if for some reason she could not, Amy was willing to; or if it turned out that neither of them could carry then they agreed that they would adopt children.
Ultimately, they chose to work with Buffalo Infertility and IVF Associates to pursue medically assisted reproduction through in vitro fertilization (IVF). All credible evidence demonstrated that Amy and Lisa attended appointments together and participated fully in the process. Records from Buffalo Infertility and IVF Associates were received in evidence as Petitioner's Exhibit 15, which corroborate Amy's testimony. Amy testified that they were both educated on the fertility process and options for sperm donors.
It is widely recognized that the IVF process can be physically grueling, emotionally draining and financially challenging. Amy and Lisa's journey to start a family is no exception. All credible evidence demonstrated that two (2) years passed between Amy and Lisa's first consult at Buffalo Infertility and IVF Associates (January 2017) to the first insemination (October/November 2018). In the meantime, there was testing and follicle measuring, egg retrieval, fertility tracking and donor selection that had to be completed. Amy testified that she and Lisa made a joint decision to use the California Cryo Bank for sperm because of their high rate of pregnancy.
While the parties dialogued about choices of sperm and narrowed down the candidates, Amy admitted that Lisa made the final choice for the donor. Amy was present at both of Lisa's inseminations and testified that she offered moral support by holding her hand and foot throughout the process. She explained that they cried together.
Lisa's first insemination resulted in a pregnancy that the couple announced to each of their respective families around Christmas 2018. Amy testified that "little booties" were purchased as gifts for the baby's future grandparents on both sides of the family and announcements were made at holiday celebrations. Petitioner's Exhibit 4 in evidence is a Facebook post in which Amy shared in part, "I'm going to finally be a mother."
Unfortunately, when both parties presented to Buffalo Infertility and IVF Associates in January 2019 for a test to assess fetal viability, they learned that the pregnancy was not viable. Saddened, but undeterred from starting a family, Amy testified that after Lisa endured a D&C (dilation and curettage — a procedure to remove the nonviable uterine tissue) they tried again to start a family shortly after Lisa's next menstrual cycle.
After the second insemination, they learned Lisa was pregnant again — this time with twins. Amy testified that around this time they travelled to Fort Lauderdale and visited a place called Sebastian Beach. One subject child is named "Sabastian" after this beach. The other is named "Sullivan" after Dr. Michael Sullivan, the doctor who assisted their reproduction process at Buffalo Infertility and IVF Associates. Amy testified that she was intimately involved in naming the babies [*3]and in fact, Sabastian carries the middle name "Chester" after her grandfather.
Amy testified that they were thrilled to be having twins. Around Mother's Day 2019, Lisa posted an announcement to her Instagram Account which included a photo and a statement. The statement appears underneath the photo and reads "Happy early Mother's Day to us" followed by a series of emojis. The photo depicts two "onesies" sandwiching a message board that reads (in all caps): "PINK OR BLUE, EITHER WILL DO, WE ARE NOT HAVING ONE BABY, WE ARE HAVING à TWO." One onesie reads "Sometimes when you wish for a miracle" and the other reads, "You get two." (See, Petitioner's Exhibit 5 in evidence) Amy testified that she participated in creating the message board for the Instagram post and emphasized the use of the plural pronouns during her testimony.
Amy testified that once Lisa's pregnancy was far enough along, they transferred to an obstetrician in Allentown and then again to a clinic next to Oshei Children's Hospital in Buffalo because the pregnancy was considered high risk. Amy testified that she attended between ten (10) to twelve (12) medical appointments with Lisa throughout her pregnancy among other things. She also toured Children's Hospital with Lisa and determined together that this is where the babies would be delivered. In preparation for maternity/childbirth, they both attended an eight (8) week course at Children's Hospital in Buffalo, New York. They also attended lactation classes in a separate location in Snyder, New York and retained a doula.
Amy testified that they held several celebrations in anticipation of the babies' birth. They had a gender reveal party where both Amy and Lisa's families were in attendance among all their friends. She stated that they had games where people could guess what the gender would be and a pyrotechnic display that announced that the babies were twin boys. Two (2) separate baby showers were held — one in Buffalo and one in Syracuse as Amy hails from the Buffalo area and Lisa from the Syracuse area. They were both the guests of honor at each baby shower. Photographs of the Buffalo Baby Shower were received in evidence as Petitioner's Exhibit 7 depicting both parties opening gifts and posing with their own and each other's family members as they celebrated and prepared for the upcoming arrival of their babies.
Amy testified that she was present at the birth of Sabastian and Sullivan, and for the nearly twenty-three (23) hours of labor that Lisa endured in advance of their birth. Amy was the one to cut each child's umbilical cord and the first to hold each boy as he arrived. Petitioner's Exhibit 8 in evidence are photos and social media posts depicting Amy and Lisa welcoming Sabastian and Sullivan into the world.
After their birth, Amy testified that she filled out paperwork for the Office of Vital Statistics for the children's birth certificates. The paperwork she was given had a place for a mother's name and a father's name. As she intended to be named on the children's birth certificates as their lawful parent, Amy testified that she crossed out the word "father" and wrote "mother 2"; however, this paperwork was summarily rejected by the Office of Vital Statistics.
Within two (2) days of the children's birth, Amy filled out paperwork requesting Paid Family Leave from work so that she could bond with her newborn sons. Petitioner's Exhibit 9 in evidence is the copy of her Request for Paid Family Leave "Bonding Certificate" wherein she lists the children as hers, born to her domestic partner. She was required to provide proof of her own parental relationship to be permitted paid family leave. Amy explained that she was able to satisfy the requirements and provide documentation that allowed her as "Parent B" to take paid family leave. Though not in evidence, Exhibit J attached to each Parentage Petition before the court references Amy as "Parent B" to Sabastian and Sullivan.
Amy testified that from the day the boys were born, Lisa and the boys referred to her as "Momma", while Lisa was called "Mommy". Petitioner's Exhibit 10 received in evidence are two (2) of Lisa's social media postings. She posted photographs of each baby sleeping at one (1) month old and typed in facts about them. At the top of each photo is a typed in statement, "Stole my mom's [sic] hearts" and towards the bottom above each child's name is a second statement — "loves cuddling with mommy & momma" for Sabastian and "loves to snuggle with mommy & momma" for Sullivan. Amy again emphasized Lisa's use of the plural "moms' hearts" and the use of both "mommy & momma" to demonstrate her status as an intended parent. It is undisputed that Amy, Lisa, Sabastian and Sullivan resided together as an intact family from the boys' birth through June 2022, when Lisa and Amy separated.
Amy testified that the boys were diagnosed with level three (3) autism spectrum disorder and as a result have significant special needs that require services like occupational therapy, physical therapy, speech therapy among other interventions. Amy participated in their evaluations at Aspire of WNY and Summit as she and Lisa learned more about their special needs.
Amy testified lovingly and competently about the boys. Her testimony demonstrated that she was intimately involved in their care. She regularly attended pediatric appointments and participated in the normal day to day parenting tasks of bathing, feeding, changing, holding, and playing with the children. Photographs received in evidence as Petitioner's Exhibit 11 corroborate Amy's testimony that she, Lisa and the boys operated as a family by taking vacations together, celebrating important milestones together, sharing in family traditions together as they bonded and matured as a family.
Amy testified that she and Lisa continued to co-parent the children after they separated in June 2022 up until approximately December 2022. Petitioner's Exhibit 12 in evidence depicts a calendar they created to delineate Amy's regular parenting time. Amy testified that post separation, she typically had parenting time every Tuesday and Thursday, and alternate weekends.
Amy testified that without warning or further explanation, Lisa abruptly cut off her access to the boys around December 2022. She believes that this was in retaliation for Amy meddling in Lisa's new relationship with a married woman, by advising Lisa's new girlfriend's spouse of their affair. Once her access to Sabastian and Sullivan was terminated by Lisa, Amy hired counsel. Amy testified that her attorney made several attempts to connect with Lisa to solidify their parenting plan and avoid the instant litigation. When months passed with no response, Petitioner filed the pending parentage petitions seeking court intervention.
Witness: Colby D.Colby D. testified that she is a Board-Certified Nurse Practitioner and has been employed by Buffalo Infertility and IVF Associates for seven (7) years. Colby D. presented as knowledgeable, competent, and truthful.
She testified that she meets with patients who want to expand their families. When unmarried couples are present, she explains what their rights and responsibilities will be as parents to both of them, but only the carrier can sign the consent. There is no signature line for the other intended parent in these situations. She explained that the consent forms are different for married couples.
She testified that she recalled meeting with Amy and Lisa. She identified them as a couple who wanted to start a family together. She formed this impression because they attended appointments together and participated jointly in the process of pursuing insemination using donor [*4]sperm. When asked what her impression was of Amy's role was going to be specifically, she testified that she "thought Amy was going to parent the children."

CONCLUSIONS OF LAW
The instant case calls for this court to determine whether Amy is the legal parent of Sabastian and Sullivan. When determining parentage of children born through assisted reproduction to unmarried couples, in the absence of adoption or an agreement between the parties, the court can find guidance and authority on how and when to intervene from the following statutes: Family Court Act § 581-201: Judgment of Parentage; Family Court Act §581-206: Jurisdiction, and exclusive continuing jurisdiction (which is subject to the jurisdictional standards of Domestic Relations Law §76: Initial Child Custody Jurisdiction); Family Court Act § 581-304: Consent to Assisted Reproduction and finally, Family Court Act § 581-701: Remedial.
To say this is a complicated thread to follow would be an understatement. Yet, practice commentaries and caselaw also provide guidance that when read together with the above-named statutes allows blessed simplicity to emerge. All the above referenced statutes fall under Article 5-C of the Family Court Act, better known as The Parent Child Security Act. This statute was enacted in or around 2021 (after the birth of the subject children here) and is meant to be applied retroactively to protect children born through assisted reproduction.
Family Court Act §581-701 states in relevant part that "this legislation is hereby declared to be a remedial statute and is to be construed liberally to secure the beneficial interests and purposes thereof for the best interests of the child." This court reversed the Support Magistrate's decision to dismiss Amy's petitions in part, based on this provision — the statute is meant to secure parental rights, not eliminate them. The Support Magistrate erroneously relied on Family Court Act 581-206(b) in concluding that jurisdiction to determine parentage lapsed after the children reached one hundred and eighty (180) days. This court concluded that this is neither a liberal construction of what the statute defines as exclusive continuing jurisdiction, nor lawful when one considers the interplay of Domestic Relation Law § 76, as the statute directs, which confers initial and continuing, exclusive jurisdiction upon the court to act. [See, Practice Commentaries McKinney's Family Court Act § 581-206, by Professor Merril Sobie which in essence advises practioners to disregard this "one hundred and eighty (180) day" limitation and abide the jurisdictional provisions of DRL § 76 and §76-a [UCCJEA] in exercising jurisdiction from the day a child is born until the day the child reaches the age of nineteen (19).]
Absence of a record or contract delineating mutual consent to conceive and parent children together is not fatal to establishing parentage. In fact, both statutory and caselaw provide that the lack of a record of consent shall not preclude a finding that such consent existed if the court finds by clear and convincing evidence that at the time of assisted reproduction the intended parents agreed to conceive and parent the child together. [See, FCA § 581-304 (c); and Brook S.B. v. Elizabeth A.C.C. 28 NY3d 1 (2016)].
Before the court addresses Amy's case in chief, it must also thoroughly consider Lisa's opposition to the requested relief. Lisa argues three (3) points in a written Memorandum of Law that she claims support her demand to deny Amy's parentage. Lisa rested her entire case on this Memorandum of Law and never called a single witness at trial to dispute Amy's claims.
Lisa's argument in opposition to Amy being granted an order of parentage is three-fold: (1) [*5]Amy should have followed through with an adoption of the children or otherwise legally defined her relationship to the children in writing, relying on Kass v. Kass, 91 NY2d 554 (1998); (2) that even if the court finds no agreement was necessary to solidify her rights as a parent, then the Doctrine of Laches must now bar Amy from asserting her rights as a parent; and (3) that if both those arguments fail, the proof Amy brings before the court to demonstrate her intention to conceive and parent Sabastian and Sullivan does not meet the required clear and convincing burden of proof.
None of Lisa's arguments were persuasive either legally or factually. Her reliance on the Court of Appeals case of Kass v. Kass, 91 NY2d 554 (1998) is woefully misguided. Her Memorandum of Law asserts that the Kass' Court holding is "in short" this: "that the intended parents must contract and form their obligations and responsibilities prior to assisted reproduction in writing." (See, Memorandum of Law, Venzon Law Firm PC) This is not the Kass holding, or even close to the spirit of the holding, so much so that this court is compelled to explain what happened in Kass more thoroughly.
The facts presented in Kass are wildly distinguishable from the ones presented in the instant matter. The couple in Kass was a married, heterosexual couple who sought assisted reproduction through IVF during their marriage. Husband and Wife jointly signed several informed consents prior to exploring reproduction through IVF which delineated their intent regarding disposition of their unused pre-zygotes. The only thing Amy and Lisa may have in common with Mr. and Mrs. Kass is that they also endured an arduous three (3) year long process of trying to start a family through assisted reproduction. Sadly, The Kass's efforts resulted only in failed pregnancies and heartache. After spending over $75,000.00 on trying to start a family, the couple divorced.
Mrs. Kass wished to pursue "sole custody" of the couple's unused pre-zygotes so that she could undergo another implantation procedure post-divorce, and Mr. Kass objected. Litigation ensued. Nassau County Supreme Court granted Mrs. Kass sole custody of the pre-zygotes, reasoning that a female participant in the IVF procedure has exclusive decisional authority over the fertilized eggs created through that process, just as a pregnant woman has exclusive decisional authority over a non-viable fetus. The trial court held that Mrs. Kass had not waived her rights to maintain exclusive decisional authority over the fertilized eggs either by signing the informed consents or by entering into the parties' uncontested divorce agreement.
A divided Second Department Appellate Division reversed that decision, and the matter came before The Court of Appeals as one of first impression. Ultimately, Mr. Kass' legal argument prevailed. He relied on the plain language of the parties' informed consents and their divorce agreement in opposing the ruling that gave Mrs. Kass sole authority of their pre-zygotes when they plainly contracted for a different outcome.
Their divorce agreement stated in relevant part, "The disposition of the frozen 5 pre-zygotes at Mather Hospital is that they should be disposed of [in] the manner outlined in our consent form and that neither Maureen Kass, Steve Kass or anyone else will lay claim to custody of these pre-zygotes." The informed consents signed by the couple stated in relevant part, that "in the event that we no longer wish to initiate a pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes and direct [the following] — our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program."
The Court of Appeals held where documentary evidence overwhelmingly demonstrates that the parties made a clear and unequivocal choice by signing informed consents and entering into a [*6]divorce agreement ratifying such consent, one party's subsequent change of heart cannot be permitted to unilaterally alter their mutual decision. It did not hold, as Lisa argues, that intended parents must contract and form their parental obligations at conception (or alternatively before the child turns one hundred and eighty (180) days old) or forever hold their peace. Neither the letter nor the spirit of the laws governing parentage and assisted reproduction are this simple or cruel.
Lisa's alternative argument is that if the absence of a contract does not prevent Amy from asserting her parental rights, then she must be barred by the Doctrine of Laches. Lisa asserts that Amy must overcome the Doctrine of Laches. (See, Memorandum of Law, Venzon Law Firm PC) This argument is again misguided.
The Doctrine of Laches is born in equity and is generally plead as an affirmative defense. "Laches is defined as 'such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.' ... The essential element of this equitable defense is delay prejudicial to the opposing party" Schulz v. State, 81 NY2d 336, 348 (1993) The Fourth Department has held that "the mere lapse of time, without a showing of prejudice, will not sustain a defense of laches." Taberski v. Taberski, 197 AD3d 871, 873, (4th Dept. 2021) (citations omitted).
Importantly, it is not for Amy to "refute" or "overcome" the Doctrine of Laches as Lisa argues. This is an affirmative defense that Lisa is asserting, therefore it is incumbent upon her to demonstrate how she (or the children) have been prejudiced by the delay in Amy establishing legal parentage. In her Memorandum of Law, Lisa reasons that had she died prior to the commencement of the instant proceedings the children would have been left without a parent. She asserts that this hypothetical fact represents both the inexcusable delay and prejudice that should prohibit Amy from being granted the relief she requests.
The court is wholly unmoved by this argument. To the extent that Lisa argues Amy waited too long to file her parentage petitions that she is somehow prejudiced, this court only re-iterates the Court of Appeals holding that when it comes to issues of parentage, "the issue does not involve the equities between the two adults; the case turns exclusively on the best interests of the child." [The Court of Appeals has repeatedly held that the paramount concern applicable to equitable estoppel in paternity proceedings has been and continues to be the best interests of the child. Shondel J. v. Mark D., 7 NY3d 320, (2006); Juanita A. v. Kenneth Mark N., 15 NY3d 1 (2010).]
New York courts have long invoked their equitable powers to ensure that matters of custody, visitation, support, and parentage were resolved in a manner that served the best interests of the child. Certainly, had Lisa died prior to Amy establishing legal parentage to the children, Amy, the children, her estate or a government agency would have several remedies available to them in equity to solidify their parent-children relationship. (See, Family Court Act § 581-202(c) and Family Court Act § 581-307) Even if Amy were considered a non-parent arguendo in the event of Lisa's hypothetical demise, she could have made an extraordinary circumstances argument in seeking a custodial disposition. Bennett v. Jeffreys, 40 NY2d 543 (1976)
Lisa has not presented any proof whatsoever that either she or the children have been prejudiced by Amy's claim for parentage. Furthermore, she has not demonstrated that granting Amy's claim would be contrary to the children's best interests. If anything, the proof established that Amy relied on Lisa in good faith that she had an equal claim to parentage of Sabastian and Sullivan, such that she need not pursue adoption or other legal remedies during their relationship. Even after their separation the parties continued to co-parent the children, until Lisa took unilateral action to excise Amy from the children's lives.
Based on the facts as presented, Amy could argue that Lisa's abrupt denial of her established position in the children's lives has prejudiced her and damaged the children's best interests since they have been denied the consistent love, affection and support of their "momma" for over one (1) year while this litigation languished. Sabastian and Sullivan are entirely innocent in the failings of Lisa and Amy to establish parentage in their immediate infancy. In the instant case, preventing Amy's parentage claim in furtherance of Lisa's assertion of laches, will only serve to harm Sabastian and Sullivan and deny them the love and support Amy is desperate to provide.
Turning now to the burden of proof issue, Lisa asserts that if all else fails, Amy cannot prove by clear and convincing evidence that she agreed to conceive and parent the children with Lisa. This final argument also misses the mark, as all credible evidence before the court is uncontroverted, clear, and convincing by every measurable standard.
Family Court Act §581-304(c) provides that in the absence of a written record of consent if a court finds by clear and convincing evidence that at the time of the assisted reproduction the intended parents agreed to conceive and parent the child together, the court is not precluded from finding that consent existed. This somewhat codifies the holding in Brooke S.B. v. Elizabeth A.C.C., 28 NY3d 1, 14 (2016), which provides that if a non-biological, non-adoptive parent can show by clear and convincing evidence that he/she/they agreed to conceive a child and to raise the child together with a partner, he/she/they has standing to seek visitation and custody.
The clear and convincing evidence standard requires the party bearing the burden of proof to present evidence that makes it highly probable that what he or she claims is what actually happened. Currie v. McTague, 83 AD3d 1184, 1185 (3rd Dept. 2011) It is a standard which serves to impress the factfinder with the importance of the decision. Such proof cannot be loose, equivocal or contradictory. Morales v. State, 705 N.Y.S.2d 176 (Ct. Cl. 2000), affirmed 722 N.Y.S.2d 860 (1st Dept. 2001).
Here, the court received both testimony and documentary evidence that was not only entirely uncontroverted, but also decidedly persuasive in convincing the court that what Amy claims is what actually happened. Lisa and Amy were in a committed relationship when they decided to start a family. They pursued the expense and the rigors of assisted reproduction together. They endured the pain of announcing a pregnancy to their friends and families after the first insemination, only to have that pregnancy fail as non-viable. Undeterred from starting a family, they tried again and Lisa became pregnant with their twins, Sabastian and Sullivan.
Before the babies came there were more announcements, some by Lisa herself asserting that the couple were preparing to be mothers together. They had a gender reveal party and baby showers where they both were the recognized guests of honor, not just Lisa, the gestating parent. Amy was present for her sons' birth and cut the umbilical cords. She participated in naming them and took special pride that Sabastian carries her grandfather's name, Chester.
Amy took paid family leave from work as a parent to the boys for purposes of bonding with them. She participated in their pediatric appointments and special evaluations when they were diagnosed with autism spectrum disorder. All the while, she loved them and supported them as a parent, participating in all the ordinary parenting tasks any other parent would do — bathing, feeding, changing, travelling, celebrating milestones, and identifying herself to them and the world as their mother.
As further evidence of the parties' intentions, Amy presented convincing credible evidence that the parties agreed to co-parent the children even after their separation. They created a calendar that delineated how they would share regular, frequent parenting time with them even after the [*7]parties' separation. All of these facts support the simple, logical conclusion that the best interests of Sabastian and Sullivan are served by designating Amy their intended, lawful parent.
DECISIONThe court after a review of all the evidence and being in the unique position to observe the demeanor and credibility of the witnesses finds that, in the totality of the circumstances, that Amy has proven her case by clear and convincing evidence that she should rightfully be named Sabastian and Sullivan's parent with every right and responsibility that comes with issuing an order and declaration of parentage. She shall have equal standing to Lisa to seek custody and parenting time, she shall be required to support the children and they may inherit from her the same as they would from Lisa. Amy has proven, by clear and convincing evidence, that she is Sabastian and Sullivan's mother.
NOW, THEREFORE, the Court having searched the statewide registry of orders of protection, the sex offender registry and the Family Court's child protective records, and having notified the parties and attorney for the child of the results of these searches; and the Court having considered and relied upon the results of these searches in making this decision it is hereby:
ORDERED that Amy's Petitions for Parentage filed under Docket Nos. P-06455 -23 and P-06457-23 are hereby granted in their entirety; and it is further
ORDERED that an Order of Parentage shall issue under separate cover on each Docket designating Amy as the legal parent of Sabastian and Sullivan; and it is further
ORDERED that pending return to court to address the pending custody petitions, the children shall not be permanently relocated from their present residence without the express consent of Amy or court permission; and it is further
ORDERED that the parties shall return to court on March 11, 2024 
@ 10:00am to address the pending custody petitions.
Dated: March 5, 2024Buffalo, New York.HON. MARY G. CARNEY